**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| BRAYDEN THOMAS CHAFFINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21CV260 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Brayden Thomas Chaffins, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Adult Child's Disability Benefits ("CDB"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 15; see also Docket Entry 14 (Plaintiff's Memorandum); Docket Entry 16 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for CDB (Tr. 184-85), alleging a disability onset date of January 28, 2000 (<u>see</u> Tr. 185).[2] Following denial of that application initially (Tr. 85-100, 116-19) and on reconsideration (Tr. 101-15, 124-31), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 132-34). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 43-84.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 14-30.) The Appeals Council thereafter denied Plaintiff's request for

---

[2] Plaintiff filed his application for CDB based upon the earnings record of his deceased father. (<u>See</u> Tr. 85, 100, 101, 115, 184.) To qualify for CDB, Plaintiff must, <u>at the time of application</u>, demonstrate that he 1) remains unmarried, 2) qualified as a dependent of his father at the time of his death, and 3) <u>either</u> has not attained the age of 18 <u>or</u> has attained the age of 18 and <u>remains</u> under a disability which began before Plaintiff attained the age of 22. <u>See</u> 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5). Plaintiff filed his CDB application on March 26, 2018, shortly after attaining the age of 18 (<u>see</u> Tr. 17, 28, 184), and the ALJ adjudicated Plaintiff's CDB claim before Plaintiff attained the age of 22 (<u>see</u> Tr. 30). Thus, to qualify for CDB, Plaintiff must, at a minimum, show that he remained disabled as of <u>March 26, 2018</u>, the protective filing date of his CDB application. <u>See Smolen v. Chater</u>, 80 F.3d 1273, 1280 (9th Cir. 1996) (holding that CDB "claimant must be disabled *continuously and without interruption* beginning before her twenty-second birthday until the time she applied for [CDB]"). The standards for demonstrating disability in a CDB claim match those of claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). <u>See</u> 42 U.S.C. § 402(d) (providing that 42 U.S.C. § 423(d) supplies applicable definition of "disability" for CDB claims); 42 U.S.C. § 423(d)(1)(A) (setting forth standard definition of "disability" for DIB claims, i.e., "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); 42 U.S.C. § 1382c(a)(3)(A) (describing same standard of disability for SSI claims); <u>see also</u> <u>Craig v. Chater</u>, 76 F.3d 585, 589 n.1 (4th Cir. 1996) ("[DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are . . . substantively identical."(internal citations omitted)).

review (Tr. 1-7, 181-82, 425-29), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings:

1. . . . [Plaintiff] had not attained age 22 as of January 28, 2000, the alleged onset date.

2. [Plaintiff] has not engaged in substantial gainful activity since January 28, 2000, the alleged onset date.

. . .

3. [Plaintiff] has the following severe impairments: personality disorders; obstructive sleep apnea; major depressive disorder, recurrent episode, moderate; attention deficit hyperactivity disorder (ADHD), predominantly inattentive presentation; disruptive mood dysregulation disorder, unspecified; post-traumatic stress disorder (PTSD); and autism spectrum disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: understand, remember, and carry out very short simple instructions; can frequently interact appropriately with the general public, supervisors, co-workers, or peers during an eight hour workday; frequently respond to changes in a workplace setting during an eight hour work day; can maintain concentration for two-hour segments over the course of an eight hour workday; and he cannot perform work that requires quotas or production levels; and any time off task can be accommodated by normal breaks.

. . .

3

6.   [Plaintiff] has no past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from January 28, 2000, through the date of this decision.

(Tr. 19-29 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial

4

evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)). "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475

6

n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignment of Error

In Plaintiff's first and only assignment of error, he asserts that "[t]he [ALJ] erred by failing to perform a proper function-by-function evaluation of all [Plaintiff]'s contested and relevant limitations and provide a logical bridge linking the evidence in the record to [the ALJ's] conclusions." (Docket Entry 14 at 6 (bold font and single-spacing omitted).)[6] In particular, Plaintiff

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

[6] Plaintiff "contends that the ALJ's conclusion that [Plaintiff] could perform the jobs of Automobile Detailer, Inspector and Hand Packager[,] and Document Preparer . . . is erroneous[, because those] jobs require a General Education Development [] Level Reasoning [('RDL')] of 2, 2 and 3, respectively" (Docket Entry 14 at 5 n.2), but the ALJ limited [Plaintiff] to tasks involving 'very short, simple instructions'" (id. (quoting Tr. 22)). Plaintiff points out that the United States Court of Appeals for the Fourth Circuit has "held that an apparent conflict existed between a 'limitation to short, simple instructions'
(continued...)

Case 1:21-cv-00260-TDS-LPA   Document 17   Filed 05/26/22   Page 8 of 29

maintains that "the ALJ's failure to conduct the proper function-by-function analysis required by [Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 (July 2, 1996) ("SSR 96-8p"),] resulted in a failure to include limitations to account for unscheduled absenteeism a[nd] breaks in addition to normal breaks allowed in competitive work," as well as "limitations in interacting with others and . . . tolerat[ing] changes and stress in the workplace." (Id. at 10.) In that regard, Plaintiff faults the ALJ for (1) "fail[ing] to consider . . . [Plaintiff's] qualifying statements regarding his activities, including his attempt to work" (id. at 10-11), (2) "'cherrypick[ing] facts that support[ed] a finding of nondisability while ignoring evidence that point[ed] to a disability finding'" (id. at 15 (quoting Lewis v.

_____

6 (...continued)
and a need to carry out 'detailed but uninvolved . . . instructions' as found in jobs requiring [RDL] 2." (Id. at 5-6 n.2 (citing Thomas v. Berryhill, 916 F.3d 307, 313-14 (4th Cir. 2019)); see also id. at 6 (citing Lawrence v. Saul, 941 F.3d 140, 143 (4th Cir. 2019), for proposition "that a limitation to 'short' instructions was inconsistent with the concept of 'detailed but uninvolved instructions' in [RDL] 2 because detail and length are highly correlated").) The ALJ erred by failing to identify and resolve the apparent conflict, as recognized in Thomas and Lawrence, between the VE's testimony that an individual limited to "very short simple instructions" could perform the jobs in question (Tr. 77-78) and the Dictionary of Occupational Titles's ("DOT") listing of those jobs at RDL 2 and 3, see DOT, No. 915.687-034 ("Automobile Detailer"), 1991 WL 687878 (G.P.O. 4th ed. rev. 1991), DOT, No. 559.687-074 ("Inspector and Hand Packager"), 1991 WL 683797, and DOT, No. 249.587-018 ("Document Preparer, Microfilming"), 1991 WL 672349. The ALJ's error in that regard, however, qualifies as harmless, as the DOT rates the three remaining jobs cited by the VE and adopted by the ALJ at step five of the SEP (see Tr. 29, 78-79) at RDL 1, which requires a worker to "[a]pply commonsense understanding to carry out simple one- or two-step instructions," DOT, No. 713.687-018 ("Final Assembler"), 1991 WL 679271, DOT, No. 381.687-034 ("Waxer, Floor"), 1991 WL 673262, DOT, No. 323.687-014 ("Cleaner, Housekeeping"), 1991 WL 672783.

9

<u>Berryhill</u>, 858 F.3d 858, 869 (4th Cir. 2017))), and (3) "fail[ing] to reconcile the conflict between [the ALJ's] RFC conclusions and the opinion evidence she found persuasive" (<u>id.</u> at 17 (citing Tr. 27)). Plaintiff deems those errors by the ALJ "harmful," because "the VE testified that[,] if [Plaintiff] were restricted to less than occasional contact with co-workers[,] . . . could not tolerate changes in the work environment . . . on at least an occasional basis[,] . . . required a bathroom or other break approximately 10 minutes of every hour[,] or was absent in excess of one day a month[,] competitive work would [] be precluded." (<u>Id.</u> at 19 (citing Tr. 81-84).) Those contentions fail to warrant relief.

RFC measures the most a claimant can do despite any physical and mental limitations. <u>Hines</u>, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. <u>See</u> <u>Hines</u>, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). <u>See</u> 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. <u>See</u> 20 C.F.R. § 404.1569a(c).

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing

specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . . The [ALJ] must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. Although the ALJ need not discuss every piece of evidence in making an RFC determination, <u>see Reid v. Commissioner of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014), he or she "must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion," <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted). As to the role of the function-by-function analysis in that determination, the relevant administrative ruling states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1.

The Fourth Circuit has addressed this administrative ruling and the issue of whether an ALJ's failure to articulate a function-by-function analysis necessitates remand. <u>See Mascio v. Colvin</u>, 780 F.3d 632, 636–37 (4th Cir. 2015). Specifically, it stated "that a per se rule is inappropriate given that remand would

11

prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested," id. at 636, but that "'remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review,'" id. (internal brackets and ellipsis omitted) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ did not perform an express function-by-function analysis of Plaintiff's work-related abilities (see Tr. 22-28); however, no basis for remand exists because, for the reasons explained more fully below, the ALJ's decision nevertheless supplies the necessary "accurate and logical bridge," Woods, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and her findings that Plaintiff's (A) mental impairments qualified as "severe" (Tr. 19) but (B) did not cause limitations greater than those reflected in the mental RFC (see Tr. 22).

### a. Qualifying Statements

Plaintiff first faults the ALJ for "fail[ing] to consider . . . [Plaintiff's] qualifying statements regarding his activities, including his attempt to work." (Docket Entry 14 at 10-11; see also id. at 14 (citing Woods, 888 F.3d at 694-95, for the proposition that "[a]n ALJ may not consider the type of activities the claimant can perform without also considering the

extent to which []he can perform them").) In that regard, Plaintiff objects to the ALJ's observation that Plaintiff "'was able to work for three months'" (id. at 11 (quoting Tr. 26)), because the ALJ "fail[ed] to note . . . that [Plaintiff] never performed this job on a full-time basis[,] . . . [and] fail[ed] to take notice of the fact that [Plaintiff] received the services of a job coach" (id. (citing Social Security Ruling 85-16, Titles II and XVI: Residual Functional Capacity for Mental Impairments, 1985 WL 56855, at *4 (1985) ("SSR 85-16") (providing that "[i]nformation concerning an individual's performance in any work setting (including sheltered work and volunteer or competitive work), as well as the circumstances surrounding the termination of the work effort, may be pertinent in assessing the individual's ability to function in a competitive work environment"))). According to Plaintiff, "the job coach appear[ed] to have facilitated communication with [Plaintiff's] supervisor, resolved misunderstandings, assisted [Plaintiff] with learning new tasks, reminded him to pace himself when he became overwhelmed, [and] educated him on finding appropriate equipment and/or asking questions or for assistance during his attempt at employment." (Id. at 12-13 (internal parenthetical citations omitted) (citing Tr. 976-79).) Plaintiff additionally points to his testimony "that he stopped going to work as a result of his mental impairments and related symptoms and resigned from his job prior to being 'let go'

13

for his performance and attendance issues" as undermining the ALJ's reliance on Plaintiff's work activity. (Id. at 13-14 (citing Tr. 47-48).) Those arguments miss the mark.

The ALJ here provided the following analysis of Plaintiff's work experience through Vocational Rehabilitation ("VR"):

> In 2018, [Plaintiff] got involved in [VR] training. A [VR] Analysis [] indicated [Plaintiff]'s impediments were difficulty focusing on work tasks, misinterpretation of oral communication from co-workers, and that he need[ed] training in small groups or individually. It was noted that [Plaintiff] wanted to work as a cashier and that he had sufficient math skills and intelligence to be successful. In November 2018, it was noted that he was working part-time at a local distribution center and he liked the job. Follow-up records in November and December 2018 indicated [Plaintiff] had a problem with attendance, tardiness, and excessive breaks at work. [Plaintiff] reported his transportation had car issues and on one occasion, he had a cut on his leg and the bandage kept coming off. It was noted during observations at work [Plaintiff] represented himself well. He was noted as doing an outstanding job when working alone. He also interacted with other workers, and helped out his fellow coworkers. Even when he switched jobs to receiving, it was noted he was doing well. [Plaintiff] reported he enjoyed working.

(Tr. 25-26 (internal parenthetical citations omitted) (emphasis added).) As the above-quoted passage shows, the ALJ acknowledged both the part-time basis of Plaintiff's employment and the fact that Plaintiff worked with VR to obtain and maintain the job.[7] Furthermore, as shown above, the ALJ recognized both the VR

---

[7] The VR records reflect that Plaintiff limited himself to part-time work because his "grandmother [wa]s pursuing disability for him," which suggests that Plaintiff avoided applying for full-time jobs because he did not want such work to disqualify him for benefits. (Tr. 981.)

14

counselor's positive _and_ negative observations about Plaintiff's performance.[8]

Moreover, although Plaintiff testified that he left work because of anxiety-induced nausea, vomiting, and diarrhea which caused him to take excessive bathroom breaks and to miss work (see Tr. 48, 50-59), the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 23). Indeed, the VR records do not support Plaintiff's testimony regarding frequent on-the-job bouts of nausea, vomiting, and diarrhea causing excessive bathroom breaks and absenteeism. Those records reflect that, on one occasion, Plaintiff took extra breaks to deal with a bandage on his leg (see Tr. 978), and, on two other occasions, Plaintiff missed work due to "transportation . . . issues" (Tr. 977) and "appointments," which he then adjusted to conform to his work hours (Tr. 980). The record also does not support Plaintiff's testimony that his mental

---

[8] Plaintiff testified that he worked at the distribution center for approximately three months, from November 2018 to February 2019. (See Tr. 47.) The record, however, strongly suggests that Plaintiff began his part-time employment at the distribution center on or about August 20, 2018 (see Tr. 189 (indicating "DATE HIRED" as "2018-08-20"); see also Tr. 977 (VR review in November 2018 indicating Plaintiff received pay raise after working 90 days)) and thus maintained his employment for over five months. Information in the record regarding Plaintiff's earnings in 2018 also indicate that he worked approximately five or more months at the distribution center. Those records reflect that he worked 12 hours per week at a pay rate of $14 per hour (see Tr. 976) and that, as of November 20, 2018, he received a pay raise to $14.50 per hour (see Tr. 977 (VR review in November 2018 indicating Plaintiff received pay raise after working 90 days), 978 (reflecting pay rate of $14.50 per hour)). As he earned $2,790 in 2018 (see Tr. 186), even taking into account Plaintiff's $.50 pay raise and a $250 bonus (see Tr. 978), Plaintiff must have worked at least 15 weeks in 2018 alone.

15

symptoms eventually forced him to resign in lieu of termination (see Tr. 48, 50) – the VR records do not even mention Plaintiff's termination from employment, let alone the reasons therefor (see Tr. 969-87) and, as the ALJ observed, Plaintiff's "grandmother reported [to Plaintiff's psychiatrist that Plaintiff] was fired because he stopped going and he complained about the job until he was let go" (Tr. 26 (citing Tr. 988)).

Moreover, although Plaintiff claims, without citation to the record, that, "when the job coach reduced her services[, Plaintiff's] attendance at work declined" (Docket Entry 14 at 13), the VR records reflect no such phenomenon. The job coach indicated she would reduce the frequency of her job visits in connection with Plaintiff's job performance review in December 2018 (see Tr. 979), but she discussed attendance and tardiness issues relating to Plaintiff's transportation problems, the bandage on his leg, and conflicting medical appointments at all three of his performance reviews (see Tr. 977-78, 980), and the January 2019 review expressly notes that Plaintiff "had been to work on time and continue[d] to enjoy working" (Tr. 980 (emphasis added)).

Plaintiff additionally objects to the ALJ's reliance on Plaintiff's report to his psychiatrist "'that he was working on getting his [drivers] license and studying for it'" to discount Plaintiff's subjective symptom reports (Docket Entry 14 at 14 (quoting Tr. 26, and citing Tr. 988)), noting that Plaintiff made

that report on June 17, 2019, and that, "as of the date of his hearing – August 29, 2019 – [he] did not report any progress towards getting his license . . . because he was 'afraid to get behind the wheel'" (id. (quoting Tr. 68)). Plaintiff also disputes "the ALJ['s] conclu[sion] that [Plaintiff's] report in April 2018 that he would like to get a job somewhere after graduating high school undermined his allegations regarding the severity of his symptoms." (Id. at 15 (citing Tr. 26, and referencing Tr. 872).) In Plaintiff's view, "the ALJ ignore[d] the evidence regarding the actual extent to which [Plaintiff] followed through with his reported desires" regarding obtaining his drivers license and a job. (Id.)

The ALJ did not "ignore[] the evidence regarding the actual extent to which [Plaintiff] followed through with his reported desire[]" (id.) to obtain his drivers license, because the ALJ merely (and accurately) noted Plaintiff's stated goal to obtain the license, as well as his report that he had begun studying to accomplish that goal, and did not find that Plaintiff actually obtained his driver's license. (See Tr. 26; see also Tr. 988.) Moreover, Plaintiff's interest in obtaining his license and his ability to take steps towards achieving that goal, i.e., studying, have some tendency to undermine Plaintiff's allegations of disabling mental symptoms. In the same vein, the ALJ did not "ignore[] the evidence regarding the actual extent to which

17

[Plaintiff] followed through with his reported desire[]" (id.) to obtain a job because, as discussed above, the ALJ adequately acknowledged the part-time nature of the job, the fact that VR assisted Plaintiff with obtaining and maintaining the job, that Plaintiff received both negative and positive feedback on his performance, and that Plaintiff ultimately left the job after a few months. (See Tr. 25-26.)

In short, Plaintiff simply has not shown that the ALJ failed to sufficiently consider Plaintiff's qualifying statements regarding his work and other activities.

## b. Cherry-Picking

Plaintiff next challenges the ALJ for "'cherrypick[ing] facts that support[ed] a finding of nondisability while ignoring evidence that point[ed] to a disability finding.'" (Docket Entry 14 at 15 (quoting Lewis, 858 F.3d at 869).) More specifically, Plaintiff contends that "the ALJ [sic] reliance on notations in the record, including the VR records, that [Plaintiff] was enjoying work, helping out fellow co-workers and representing himself well and medical records that indicate that he was feeling well, getting along with this [sic] grandmother, denied mood disturbances and aggressive outbursts, etc[.] to support [the ALJ's] conclusion that [Plaintiff's] allegations were not consistent with the record [wa]s [] misplaced" (id. (internal parenthetical citations omitted)

18

(citing Tr. 26)) and "taken out of context" (id. at 17). Those contentions fall short.

Plaintiff first critiques the ALJ's reliance on the VR counselor's observations that Plaintiff "represented himself well," "was noted as doing an outstanding job when working alone," "helped out his fellow coworkers," and continued to "do[] well" even after "switch[ing] jobs" (id. at 16 (referencing Tr. 26, and citing Tr. 977)), because the ALJ "fail[ed] to note that the rest of th[at] record also reflects that the job coach was present supporting [Plaintiff] by demonstrating the job tasks, reminding him to pace himself and 'comforting him' when he was sweating a lot and getting incoherent" (id. (citing Tr. 977)). To begin, the ALJ need not discuss every piece of evidence in making an RFC determination, see Reid, 769 F.3d at 865, and, as discussed above, the ALJ sufficiently recognized and discussed VR's involvement in Plaintiff's employment as well as both the positive and negative observations of the VR counselor regarding Plaintiff's work performance at the distribution center.

Next, Plaintiff contests the ALJ's discussion of 2018 treatment records "reveal[ing] that [Plaintiff] did not report severe mood disturbance or aggressive outbursts and that he was generally feeling well," because "th[o]se records also reflect that [he] was no longer in high school" (Docket Entry 14 at 16 (referencing Tr. 26, and citing Tr. 870, 872)), and Plaintiff

19

"testified that he experienced similar difficulties when attending school with those he suffered when attempting to work" (id. (citing Tr. 54)). Plaintiff's attempt to lessen the significance of his largely normal findings on mental status examinations in April and July 2018 because he "was no longer in high school" (id.) does not hold up. At a visit to Plaintiff's psychiatrist on November 19, 2018, after Plaintiff had already worked at the distribution center for approximately 90 days (see Tr. 189, 977), Plaintiff advised that he "like[d] the job[,] . . . [wa]s not having any problems with mood lability, agitation, aggression, [or] extreme distress, [and wa]s sleeping well and . . . functioning well [] all through the day" (Tr. 882). Plaintiff's psychiatrist noted that Plaintiff displayed "good eye contact," while remaining "respectful" and "polite and engaged" with normal speech and thoughts. (Id.)

Plaintiff additionally takes issue with the ALJ's "repeated[] mentions [of Plaintiff's] ability to play video games," because the ALJ "d[id] not explain how [playing video games] undermine[d] [Plaintiff's] allegations regarding his mental health related symptoms and limitations." (Docket Entry 14 at 16 (referencing Tr. 26).) In that same regard, Plaintiff faults the ALJ for noting that Plaintiff could "'play video games and spend the night with friends sometimes' but fail[ing] to note that in the same record [he] presented for discharge follow-up after an involuntary commitment from November 7[] through [] 12, 2016 due to suicidal

behaviors and a fear of hurting himself or others" (<u>id.</u> (referencing Tr. 26, and citing Tr. 584-85)) and displayed "poor eye contact, agitation, disrupted mood, flat and withdrawn affect, [and] impaired concentration and focus" (<u>id.</u> (citing Tr. 908-19)).

As an initial matter, Plaintiff's ability to play video games bears upon his ability to maintain focus and concentration, <u>see</u> <u>Luke W. v. Saul</u>, No. 6:19CV58, 2021 WL 1132598, at *4 (W.D. Va. Mar. 24, 2021) (unpublished) (finding no error in ALJ's finding that playing video games "require[s] some level of concentration" (emphasis omitted)); <u>Bowcott v. Berryhill</u>, No. 3:17CV2329, 2018 WL 4583617, at *5 (S.D.W. Va. Sept. 25, 2018) (unpublished) (determining that ALJ's reliance on the plaintiff's ability to play video games "support[ed] the [ALJ's] finding that [the plaintiff] ha[d] the capacity to maintain concentration, persistence, and pace" (internal quotation marks omitted)); <u>Harris v. Berryhill</u>, No. 1:16CV140, 2017 WL 1755968, at *5 (M.D.N.C. May 4, 2017) (unpublished) ("[T]he ALJ noted that [the p]laintiff remained able to engage in various daily activities, such as playing video games, . . . which require the ability to focus and concentrate to some degree."), <u>recommendation adopted</u>, slip op. (M.D.N.C. May 25, 2017) (Biggs, J.); <u>Smith v. Colvin</u>, No. 2:13CV37, 2014 WL 4322323, at *5 (E.D.N.C. Aug. 7, 2014) (unpublished) (holding that the plaintiff's ability to "use a computer[] and play video games[] indicat[ed] that [he] could focus on tasks to the extent necessary

21

to hold a job"), <u>recommendation adopted</u>, 2014 WL 4352338 (E.D.N.C. Sept. 2, 2014) (unpublished), an area in which Plaintiff has alleged difficulty (<u>see</u> Tr. 73, 248; <u>see also</u> Tr. 240 (Function Report completed by Plaintiff's grandmother indicating Plaintiff had problems concentrating)). As such, the ALJ did not err by relying, in part, on Plaintiff's ability to play such games in discounting Plaintiff's subjective symptom reporting. (<u>See</u> Tr. 26.)

Moreover, Plaintiff glosses over the fact that the ALJ expressly discussed Plaintiff's inpatient hospitalization in November 2016:

> At the age of 16, . . . [Plaintiff] had an inpatient hospitalization at Old Vineyard Behavioral Health Services for fear of hurting himself and other people. It was noted that he was feeling stressed after red ribbon week and overwhelmed due t[o ]his past history of being in foster care due to his mother's drug abuse and incarceration. [Plaintiff] reported feeling unsafe to be home and wanted to be in a hospital setting for further stabilization. He complained of racing thoughts, pressured speech, and suicidal behaviors. [He] was admitted to the adolescent unit and placed on suicide precautions. He was treated with Lexapro, Intuniv, Buspar, and Abilify. Initially, he was extremely anxious and preoccupied with wanting to go home and minimizing the extent of his difficulties. He also had problems with attention and concentration. Accordingly, his medication had to be adjusted. After adjustment, [he] became more cooperative, complaint [sic] and engagable [sic] in his treatment work. He tolerated medications well without side effects. He denied any suicidal or homicidal thoughts at least 24 hours prior to discharge. He was advised to follow up with Daymark Recovery Services.

22

(Tr. 25 (internal parenthetical citation omitted).) Although the ALJ did not expressly mention Plaintiff's clinical assessment by a counselor at Daymark on November 21, 2016 (see Tr. 25) relied on by Plaintiff (see Docket Entry 14 at 16 (citing Tr. 908-19)), the ALJ did discuss Plaintiff's follow-up visit with his psychiatrist at Daymark on the same date, noting that the visit "indicated that[,] since [Plaintiff's] hospitalization[, he] reported he felt safe and was no longer thinking of his childhood trauma" (Tr. 25 (citing Tr. 663)).

In sum, Plaintiff has not demonstrated that the ALJ improperly cherry-picked the evidence of record in determining the RFC.

## c. Conflicts Between Opinion Evidence and RFC

Lastly, Plaintiff maintains that the ALJ "fail[ed] to reconcile the conflict between her RFC conclusions and the opinion evidence she found persuasive." (Docket Entry 14 at 17 (citing Tr. 27).) In particular, Plaintiff argues that the ALJ found the opinions of the initial-level state agency psychological consultant persuasive, but then failed to either incorporate that consultant's limitations to a "low social setting" and a "'stable work assignment'" into the RFC or to explain why the ALJ did not do so. (Id. at 18 (citing and quoting Tr. 97).) That argument ultimately lacks merit.[9]

---

[9] Plaintiff additionally complains that "the ALJ concluded that [Plaintiff] ha[d] a 'mild limitation' in understanding, remembering, or applying information" at step three of the SEP (Docket Entry 14 at 17 (quoting Tr. 21)), but yet found
(continued...)

The ALJ provided the following analysis of the persuasiveness of the state agency psychological consultants' opinions:

> The [s]tate agency psychological consultant at the initial level opined that [Plaintiff] could understand and remember simple instructions; he could maintain attention and concentration for two-hour periods over an eight-hour day in order to carry out simple tasks; he can accept instructions from supervisors and interact appropriately with the public and coworkers in a <u>low social setting</u>; he would be slow to adapt to change but can function with a <u>stable work assignment</u>; and he could be aware of hazards, negotiate transportation to work, and plan for simple tasks. The [s]tate agency consultant at the reconsideration level opined that [Plaintiff] could understand and remember more than simple instructions; he could maintain attention and concentration for two-hour periods over an eight-hour day in order to carry out more than simple tasks; he can accept instructions from supervisors and interact appropriately with the public and coworkers in a low social setting. <u>The [ALJ] finds the opinion of the [s]tate agency psychological consultant at the initial level persuasive</u> and the opinion of the [s]tate agency consultant at the reconsideration level not persuasive because the [s]tate agency opinion at the initial level is supported by the record. The record showed [Plaintiff] has a history of autism spectrum disorder, and depression/mood disorder. He was placed on an [Individualized Education Plan ("IEP")] for specific learning disorder but his full scale IQ was 109, indicating average intelligence and he also score [sic] in the low average to superior range in all other

---

[9] (...continued)
"persuasive" the initial-level state agency psychological consultant's opinions (<u>id.</u> (citing Tr. 27)), which included a "moderate limitation in this area" (<u>id.</u> (citing Tr. 92)). That contention fails for two reasons. First, the ALJ did not specifically credit the consultant's opinions regarding Plaintiff's degree of limitation in the paragraph B criteria of the mental listings (<u>see</u> Tr. 21 (containing ALJ's rationale for finding a mild limitation in understanding, remembering, or applying information and lacking any reference to consultant's opinion)); instead, the ALJ explained that she found "persuasive" the consultant's mental RFC findings (<u>see</u> Tr. 27). Second, even if the ALJ had erred by not finding Plaintiff moderately limited in that area, Plaintiff has not shown how such error prejudiced her. A moderate limitation falls below listing level severity, <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04B, 12.06B, 12.08B, 12.10B, 12.11B, 12.15B, and the ALJ already included a limitation to "very short simple instructions" in the RFC (<u>see</u> Tr. 22).

intelligence categories. He has had a history of multiple inpatient hospitalizations for suicidal ideation and rage, but his last hospitalization was three years ago. Most recent treatment records indicated [Plaintiff] had stable mood with medication. He was alert and oriented to person, place, time, and situation. He had flat affect, depressed mood, and minimal eye contact, but he denied suicidal and homicidal ideation. He endorsed feelings of low self-confidence and low self-worth but he had no delusions, psychosis, or auditory visual hallucinations.

(Tr. 27 (internal parenthetical citations omitted) (emphasis added).) The ALJ concluded her RFC evaluation by stating that, "to accommodate [Plaintiff]'s mental disorders, the [RFC] limits him to simple tasks with no quota or production work, <u>frequent social interaction</u>, <u>frequent workplace changes</u>, and maintaining attention and concentration for two-hour increments over an eight-hour workday" and observing that the RFC "[wa]s <u>consistent</u> with the opinion of the [s]tate agency psychological consultant at the initial level who also found [Plaintiff] had the <u>same</u> mental limitations." (Tr. 28 (emphasis added).)

The SSA has adopted the <u>Dictionary of Occupational Titles</u>'s definition of "frequent," <u>see</u> 20 C.F.R. § 404.1567, which means occurring from <u>one-third to two-thirds</u> of an eight-hour workday, <u>see</u> <u>Dictionary of Occupational Titles</u> ("<u>DOT</u>"), App'x C ("Components of the Definition Trailer"), § IV, 1991 WL 688702 (4th ed. rev. 1991) (emphasis added). Accordingly, the ALJ's RFC limitations to "<u>frequent</u> social interaction" and "<u>frequent</u> workplace changes" (Tr. 28 (emphasis added); <u>see also</u> Tr. 22), exposing Plaintiff to on-

25

the-job interaction with co-workers, supervisors, and the general public and to changes in his work environment for up to two-thirds of an eight-hour workday, conflict with the initial-level state agency psychological consultant's limitations to a "low social setting" and a "stable work assignment" (see Tr. 97). See Crisco v. Kijakazi, No. 1:20CV239, 2021 WL 4414155, at *6 (M.D.N.C. Sept. 27, 2021) (unpublished) (Osteen, J.) (finding that ALJ's restriction to "no more than occasional interaction with coworkers and supervisors[]" . . . account[ed] for the [state agency psychological] consultants' limitation to "a . . . low social setting" (emphasis added)).

The ALJ's error in that regard, however, qualifies as harmless under the circumstances presented here. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). As the Commissioner argues, "two of the jobs the ALJ ultimately found Plaintiff able to perform – Floor Worker, [DOT No.] 381.687-034, 1991 WL 673262 and Housekeeper, [DOT No.] 323.687-014, 1991 WL 672783 – have a 'People' rating of 8 in the [DOT], meaning that 'Taking Instructions – Helping' is 'Not Significant'" and "'reflect[s] the lowest possible level of human interaction that exists in the labor force.'" (Docket Entry 16 at 12 (quoting

26

<u>Fletcher v. Colvin</u>, No. 1:15CV166, 2016 WL 915196, at *10 (M.D.N.C. Mar. 4, 2016) (unpublished), <u>recommendation adopted</u>, slip op. (M.D.N.C. Mar. 28, 2016) (Osteen, C.J.)).) Similarly, the Commissioner points out "that those [same] jobs require a [General Educational Development ('GED')] level of 1," which "involve[s] dealing with *standardized situations with occasional or no variables* in or from these situations encountered on the job." (<u>Id.</u> at 13 (emphasis supplied by the Commissioner) (citing <u>DOT</u>, No. 381.687-034 ("Floor Worker"), 1991 WL 673262, and <u>DOT</u>, No. 323.687-014 ("Housekeeper"), 1991 WL 672783).) Moreover, the VE testified (and the ALJ found) that more than 1.7 million Floor Worker and Housekeeper jobs existed in the national economy (<u>see</u> Tr. 29, 78), which clearly represents a significant number of jobs under Fourth Circuit precedent, <u>see</u> <u>Hicks v. Califano</u>, 600 F.2d 1048, 1051 (4th Cir. 1979) ("We do not think that the approximately 110 jobs testified to by the [VE] constitute an insignificant number.").

Consequently, Plaintiff has not shown that remand for the ALJ to include limitations to accommodate a low social setting and a stable work assignment in the RFC would result in a different outcome in his case. <u>See</u> <u>Wilson v. Saul</u>, No. 1:19CV1089, 2020 WL 6293132, at *4 (M.D.N.C. Oct. 27, 2020) ("[E]ven assuming the ALJ erred here by failing to include additional social limitations in the RFC . . ., any error would be harmless because the jobs the ALJ concluded that [the p]laintiff could perform do not require

27

significant social interactions."), recommendation adopted, slip op. (M.D.N.C. Nov. 24, 2020) (Biggs, J.); Knott v. Colvin, No. 1:13CV332, 2014 WL 2453302, at *6 (M.D.N.C. June 2, 2014) (unpublished) (Schroeder, J.) (deeming ALJ's failure to include any interaction limitations in RFC to account for state agency psychological consultant's opinion (to which ALJ accorded great weight) that Plaintiff required work in a "low social setting" harmless error, because two of three jobs cited by VE and adopted by ALJ at step five of the SEP "d[id] not require a high degree of social interaction" (citing DOT, No. 209.587-034 ("Marker"), 1991 WL 671802, and DOT, No. 207.685-014 ("Photocopying-Machine Operator"), 1991 WL 671745)); see also Farnsworth v. Astrue, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (ruling ALJ's failure to include limitation in hypothetical question to VE constituted harmless error where "no evidence [existed] th[at] inclusion of the limitation . . . would have resulted in a different finding by the ALJ regarding the availability of jobs in the national economy").

In light of the foregoing reasons, Plaintiff's first and only issue on review fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for

Judgment on the Pleadings (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) be granted, and that this action be dismissed with prejudice.

                                    /s/ L. Patrick Auld
                                  **L. Patrick Auld**
                        **United States Magistrate Judge**

May 26, 2022